IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES EDWARD FANN          :
(AIS 189321),               :
    Plaintiff,              :
                 :
vs.                          :          CIVIL ACTION 14-0302-CG-M
                 :
PAMELA BARBER, *et al.*,      :
    Defendants.             :
                 :


## REPORT & RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis* filed a complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of Defendants Pamela Barber and Bennie Andrews (docs. 16, 29, 32, 33), and Plaintiff's opposition thereto (doc. 45).  For the reasons stated below, it is recommended that the motion for summary judgment of Defendants Barber and Andrews be granted and that Plaintiff's action against Defendants be dismissed with prejudice.

**I.   Summary of Facts and Background.**

Plaintiff, Charles Edward Fann, is currently incarcerated at Holman Correctional Facility ("Holman"), where he is serving two concurrent sentences, a life

sentence for murder and a 30-year sentence for attempted murder. (Doc. 1 at 5, 8). On November 5, 2013,[1] Plaintiff was injured while playing basketball during the allotted recreation time. (*Id*. at 10; Doc. 29-1 at 25). He was immediately taken to the health care unit ("HCU") following the injury due to the fact that he was experiencing pain in his left ribs and trouble breathing. (Doc. 1 at 10). In the HCU, Plaintiff informed the nursing staff that he "believe[d] something was damage[d] or broken" due to the basketball accident. (*Id*. at 10-11). Plaintiff received two shots for the complained of pain and was observed in the unit for approximately five hours before being released. (*Id*. at 10). While in the medical ward,

---

[1] Plaintiff states he was outside playing basketball when he injured himself by chasing a re-bound ball and accidentally hitting a "pole by accident." (Doc. 1 at 10). The Court, however, is not certain of the exact date of injury. Plaintiff alleges he injured himself playing basketball in "October of 2013" and was taken immediately to the medical unit as he was experiencing pain and trouble breathing. (*Id*.; *see also* Doc. 45 at 2). However, the medical records indicate that Plaintiff was first examined for the injury on November 5, 2013, "10 minutes" after the alleged incident occurred. (Doc. 29-1 at 25-27; Doc. 33-1 at 24-26). Given that the specific date of injury is not determinative on the outcome of this motion, the Court takes as true Plaintiff's statement that he was seen in the HCU immediately following the basketball accident, and the Court relies on the objective medical records as evidence of the date of the accident. Thus, the Court will refer to the date of injury as November 5, 2013.

Defendant Dr. Pamela Barber examined Plaintiff and detected a "bulging" to the left lower quadrant of Plaintiff's abdomen. (Doc. 33-1at 26; Doc. 29-1 at 27). Plaintiff alleges Defendant Barber stated that the bulge or knot "was irregular and not normal and stated that she would order a ("M.R.I.") or some other special xRay to be done to see as to what causing [Plaintiff] not to breath [sic] normal which this was never order or done." (Doc. 1 at 11). Following Defendant Barber's assessment of Plaintiff, she did, however, order a chest x-ray to view Plaintiff's left ribs, which indicated Plaintiff suffered no broken bones or other complications or abnormalities. (*Id*. at 11; Doc. 33-1 at 29). No further tests were conducted at that time, and Plaintiff was released with a prescription for pain medication and a steroid medication for the next three days. (Doc. 33-1 at 27; Doc. 29-1 at 28).

The following day, November 6, 2013, Plaintiff complained of "very bad pain in side and chest and short of breath[]" and requested to be seen at sick call. (Doc. 33-1 at 23; Doc. 29-1 at 24). Plaintiff was screened at sick call on November 6, 2013, and orders were provided that Plaintiff "may have a lay in and not go outside for three days." (Doc. 33-1 at 22, 27; Doc. 29-1 at 23, 28).

Plaintiff's next request to be seen at sick call was on November 15, 2013, when he complained of "serious pain" in his chest, left side, and the knot on his side. (Doc. 33-1 at 21; Doc. 29-1 at 22). He contends the pain was more intense, and he continued to experience difficulty breathing. (Doc. 1 at 12). On November 15, 2013, he was examined in the HCU and received two more injections for the pain. (Doc. 1 at 13). Plaintiff states that during the examination,

> [D]octor Barber advised [him] verbally that something was really definitely wrong with [him] and that she schedule "M.R.I." to be done and that she is awaiting for Corizon to approve of it, she then sent me back down the hallway to my dormitory without keeping me on the hospital ward do [sic] to my condition as it gotten worser.

(Doc. 1 at 12). The medical records of November 15, 2013, denote the "knot" on Plaintiff's left lower abdomen was approximately two inches by two inches in size, and the medical records confirm orders for further x-rays on Plaintiff's ribs to be conducted, but the record contains no order for a M.R.I. scan. (Doc. 33-1 at 27; Doc. 29-1 at 28).

An additional x-ray was performed on November 18, 2013, and again revealed that there was no fracture to the bones and "no acute process [was] identified." (Doc. 33-1 at 29; Doc. 29-1 at 30). Defendant Barber ceased her

employment as Holman's physician on January 12, 2014, and Dr. Iliff, followed by Dr. Koon, subsequently became the prison's physician. (Doc. 33-1 at 3; Doc. 29-1 at 5; Doc. 45 at 4-5).

Defendant Bennie Andrews is the Health Services Administrator at Holman. (Doc. 29-1 at 2). While Defendant Andrews does not provide any hands on medical care, diagnosis, or treatment of inmates, he is responsible for the administration of the HCU at Holman. (*Id*. at 3). On May 29, 2014, June 5, 2014, June 8, 2014, and June 10, 2014, Plaintiff filed grievances to Defendant Andrews regarding the pain he was experiencing, asserting the knot on his side was "sticking out now in plain view."[2] (Doc. 1 at 13-14). Defendant Andrews advised Plaintiff that he had a scheduled appointment with the new physician on June 17, 2014, but Plaintiff claims he did not see the new doctor on June 17, 2014. (*Id*. at 14). The medical records corroborate Plaintiff was not examined on June 17, 2014, but the medical chart notation specifies there was a "DOC

_____

[2]     Plaintiff had previously been examined in the health care unit for his continued complaints of pain in his left side and trouble breathing on May 23, May 31, and June 11 of 2014. (*See* Doc. 33-1 at 11, 16, 18). On May 31, 2014, the medical records reveal that the knot on Plaintiff's side was "approximately golf ball size." (Doc. 33-1 at 16; Doc. 29-1 at 17).

shortage [and] patient [was] unable to be brought into HCU," and the appointment with Dr. Iliff was rescheduled for July 2, 2014. (Doc. 33-1 at 8; Doc. 29-1 at 9). Also, Plaintiff was seen by a nurse on June 18, 2014 and prescribed pain medication for the duration of one week. (Doc. 33-1 at 8, 10; Doc. 29-1 at 9, 11).

On July 2, 2014, Dr. Iliff examined Plaintiff and diagnosed a possible cartilage fracture on Plaintiff's left side and ordered a CT scan. (Doc. 33-1 at 7; Doc. 29-1 at 8). The scan was performed on July 23, 2014 and revealed:

> The lungs are well expanded and clear with no mass lesions seen. There is no hilar or mediastinal adenopathy. No vascular lesion is defined. The bony structure shows some mild to moderate degenerative disc disease in the mid to upper thoracic spine. There is a 3.3 cm low density lesion in the left kidney, probably intraperenchymal cyst.
>
> Impression: No chest abnormality seen. Left renal lesion a probable cyst.

(Doc. 29-1 at 33; Doc. 33-1 at 32). Dr. Iliff ruled out the possibility of the knot complained of being a cyst as proposed by the CT scan and continued "to evaluate the complaints of Mr. Fann with regard to the knot on his left rib cage." (Doc. 29-1 at 33; Doc. 33-1 at 32).

However, prior to his July appointment with Dr. Iliff and receipt of the CT scan, Plaintiff filed this § 1983

action with the Court on June 30, 2013, alleging the treatment he "received in October 2013 was clearly [a] grossly inadequate response to Plaintiff's medical condition." (*Id*. at 15). As a result of Defendants' actions, Plaintiff claims he has "suffered prolonged and extreme pain and unnecessary complications as it is hard for him to breath[e]." (*Id*. at 15-16). Plaintiff asserts two counts of deliberate indifference to his medical needs from October 2013 through June 10, 2014. (*Id*. at 7).

> Count One: Plaintiff alleges Defendant Barber was deliberately indifferent to his medical needs in violation of the due process clause of the Fourteenth Amendment. (Doc. 1 at 17). Plaintiff claims the knot on his left side sticks out and "will require surgery as it has develope[d] into something serious that needs a doctor['s] care right away." (*Id*. at 15).

> Count Two: Plaintiff alleges Defendant Andrews failed to provide medical treatment after numerous filed complaints thereby delaying his access to medical care and exacerbating his pain and breathing difficulties in violation of the Eighth and Fourteenth Amendments. (*Id*. at 17).

Plaintiff seeks relief of a permanent injunction for all medical care relating to his injury to be provided by outside medical doctors and facilities. (*Id*. at 17). He also requests damages in the amount of $325,000 against each defendant, punitive damages in the amount of $100,000, nominal damages in the amount of $100,000, an investigation, and a trial by jury. (*Id*. at 19-20).

Defendants Barber and Andrews answered Plaintiff's complaint (docs. 16, 32) and filed special reports (doc. 29, 33). The Court converted Defendants' pleadings into a motion for summary judgment (Doc. 37), and Plaintiff responded to the same (Doc. 45). In opposition to the motion for summary judgment, Plaintiff provides the current head physician at Holman, Dr. Koon, recommended that Plaintiff be referred to a specialist and receive surgery to remove the knot; however, for reasons unbeknownst to Plaintiff, the surgery has been postponed, and medical personnel are considering whether or not any alternative options exists to treat the complained of knot. (*Id.* at 4). Plaintiff requests the Court deny the motion for summary judgment based on Dr. Koon's assessment and recommendation that Plaintiff may possibly require surgery to remove the knot on his side. (*Id.* at 4-5). After careful consideration of the parties' pleadings,[3] the motion for summary judgment is now before the Court.

**II. Summary Judgment Standard.**

---

[3]    Plaintiff also filed a motion for preliminary injunction (Doc. 3), motion to take judicial notice (Doc. 38), second motion to compel (Doc. 39), motion to amend complaint (Doc. 40), third motion to compel (Doc. 41), and motion for extension of time (Doc. 41). The motion for extension of time to respond to the motion for summary judgment was granted. (Doc. 44). All other motions were denied in the Court's September 10, 2014 order. (Doc. 44).

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations

omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).[4]

## IV.  Analysis.

"The eighth and fourteenth amendments set limits on the treatment and conditions that states may impose on prisoners." *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1571 (11th Cir. 1985).  Plaintiff asserts his denial and delay of medical care claims pursuant to both the Eighth and Fourteenth Amendments.  (Doc. 1 at 15-17).  The Eighth Amendment standard applies to confinement that occurs

---

[4]     In evaluating the pending summary judgment motions, the Court remains cognizant of Plaintiff's nominally *pro se* status.  "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998).  Nonetheless, even *pro se* litigants must comply with procedural rules and court orders. *See, e.g., Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (explaining that "we are to give liberal construction to the pleadings of *pro se* litigants," but that "we nevertheless have required them to conform to procedural rules") (citation omitted); *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) (a *pro se* party "is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure," and may be sanctioned "for failure to comply with court orders"); Local Rule 83.9(b).  Despite the leniency afforded *pro se* litigants, courts may not serve as *de facto* counsel for *pro se* plaintiffs and rewrite filings or articulate arguments to assist plaintiffs in their cases. *See GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998).

subsequent to a person's lawful conviction of a crime, *see Ingraham v. Wright*, 430 U.S. 651, 671-72 (1977), whereas the Fourteenth Amendment standard applies to persons incarcerated as pretrial detainees, as states may not punish pretrial detainees at all prior to their lawful conviction of a crime. *Bell v. Wolfish*, 441 U.S. 520, 579 (1979). Given that Plaintiff was a convicted inmate at Holman when his claim arose, the Court will analyze the claims of this action pursuant to the Eighth Amendment.

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Courts hold that states violate the Eighth Amendment if they are deliberately indifferent to a prisoner's serious medical needs, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

*Sims*, 25 F.3d at 983 (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)).  To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003).  A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9 (2002)).  "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need.  *Farrow*, 320 F.3d at 1243.  "Deliberate

indifference" entails more than mere negligence. *Estelle,* 429 U.S. at 106; *Farmer v. Brennan,* 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting *Farmer* and *Estelle,* this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott,* 182 F.3d at 1255; *Taylor,* 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

*Farrow*, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." *Hill*, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent

that delay would detrimentally exacerbate the medical

problem." *Id.*

> The "seriousness" of an inmate's medical needs
> also may be decided by reference to the *effect* of
> delay in treatment. Where the delay results in an
> inmate's suffering "a life-long handicap or
> permanent loss, the medical need is considered
> serious." An inmate who complains that delay in
> medical treatment rose to a constitutional
> violation must place verifying medical evidence
> in the record to establish the detrimental effect
> of delay in medical treatment to succeed.
> Further, we have held that "[t]he tolerable
> length of delay in providing medical attention
> depends on the *nature* of the medical need and the
> *reason* for the delay." Consequently, delay in
> medical treatment must be interpreted in the
> context of the seriousness of the medical need,
> deciding whether the delay worsened the medical
> condition, and considering the reason for delay.

*Hill*, 40 F.3d at 1188-89 (internal citations omitted)

(footnotes omitted).

    1.  Count One.

The Court takes as true Plaintiff's assertion that the

knot located on his rib cage is a serious medical

condition. However, the undersigned finds no Eighth

Amendment violation based on the pleaded facts. There is

no evidence that Defendants Barber or Andrews disregarded

Plaintiff's "extremely serious medical need" by failing to

provide proper medical treatment. In fact, the Court finds

that Defendants consistently treated Plaintiff's medical

complaints each time he presented in the HCU. The mere

fact that Plaintiff disagrees with the efficacy of the treatment recommended, simply prefers a different course of treatment, or prefers the outside examinations and tests of a free-world doctor does not state a valid claim of medical mistreatment under the Eighth Amendment. *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment). "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). The Court finds that Defendants provided health care to Plaintiff and continued to respond to his questions and grievances. Defendant Barber relied on objective test results, as well as her medical training, experience, and judgment in determining the treatment plan for Plaintiff, and Defendant Andrews relied on doctors' recommendations for the treatment of Plaintiff. Reviewing

the facts in the light most favorable to Plaintiff, the Court finds there is no dispute of material fact, and Plaintiff has failed to present evidence in support deliberate indifference on the part of Defendants.

The crux of Plaintiff's claim against Defendant Barber is that despite verbally telling Plaintiff "she would order a ("M.R.I.") or some other special xRay" to determine the cause of his complaints (Doc. 1 at 11), Plaintiff only received a *regular* x-ray and to date has not received a M.R.I. scan. Examining the totality of the record, the undersigned finds Defendant Barber was not deliberately indifferent to Plaintiff's medical need by failing to order a M.R.I. scan.

Defendant Barber treated Plaintiff's pain proactively with injections at the time he presented to the medical unit on November 5, 2013, and with prescription medication upon his release from the unit. She observed him for several hours in the HCU before releasing him. Moreover, she personally examined Plaintiff and ordered a standard diagnostic test, which Plaintiff received immediately, and the results of which showed no signs of injury or abnormalities to alert Defendant Barber or put her on notice that Plaintiff required further treatment or in depth testing. Plaintiff's complaints of pain, trouble

breathing, and even a knot in the injured area seem plausible and expected after "running into a pole." Therefore, there is no evidence before the Court that Defendant Barber knew of any serious risk to Plaintiff's health or safety and disregarded that risk by not ordering an M.R.I. scan at that time.

Plaintiff was subsequently seen by Defendant Barber on November 15, 2013, and Defendant Barber again treated Plaintiff's pain and ordered another x-ray to rule out complications due to his recent basketball injury. Plaintiff's sole allegation of deliberate indifference is based on the fact that he did not receive a M.R.I. scan after Defendant Barber allegedly said she was ordering one for him. This alone will not suffice to support a claim of deliberate indifference. The evidence shows Plaintiff received medical care each time he presented to the health care unit, and there is no evidence in the records that the knot worsened during October/November 2013 through January 2014 when Defendant Barber ceased practicing at Holman. In fact, the evidence in the record supports finding that the knot did not grow or change in size from November 2013 to at least May 31, 2014.[5] Therefore, Plaintiff fails to prove

_____

[5]     On November 15, 2013 Plaintiff was examined in the HCU and the size of the knot on his left side was noted to be

the objective and subjective elements to his claim and fails to prove that any delay on the part of Defendant Barber as Plaintiff has suffered no detrimental effect like a "life-long handicap or permanent loss." *See Hill*, 40 F.3d at 1188-89. Furthermore, the reason for any delay in treatment was due to the negative results of objective diagnostic tests, not deliberate indifference. It should also be noted that neither of the two treating physicians who provided medical care for Plaintiff after Defendant Barber left Holman have found it medically necessary to order a M.R.I. scan for Plaintiff.

---

approximately two inches by two inches. (Doc. 33-1 at 20; Doc. 29-1 at 21). On May 31, 2014, nearly four months after Defendant Barber ceased working at Holman, the size of the knot on Plaintiff's side was determined to be approximately the size of a golf ball. (Doc. 33-1 at 16; Doc. 29-1 at 17). Two inches by two inches is essentially the same measurement as the size of a golf ball. (See United States Golf Association, http://www.usga.org/Rule-Books/Rules-on-Clubs-and-Balls/Appendix-III-%E2%80%93-The-Ball/ (last visited October 10, 2014), quantifying the size of a golf ball as having a diameter of 1.680 inches.).

It was not until July 2, 2014 that anyone noted a quantifiable physical change in size to the knot. On July 2, 2014, Dr. Iliff charted that the knot on Plaintiff's side was "egg size." (Doc. 33-1 at 31; Doc. 29-1 at 32). Although these are not technical measurements, the quote recognizes that a person's perception and description of "egg size" would be greater than "golf ball size." However, this increase in size occurred almost eight months after Plaintiff was examined by Defendant Barber and close to six months post Defendant Barber's departure from Holman.

Support for Plaintiff's claim against Defendants is the sole fact that the knot on his rib cage has worsened over the past year, and surgery may now be required to remove the knot. While this progression is unfortunate, it does not equate to liability on the part of Defendants. Medical conditions are not static; they fluctuate and change over time. The record before the Court, however, reflects that during the complained of time, while Defendant Barber was a practicing physician at Holman, the knot on Plaintiff's side did not grow in size, and Defendant always provided medical care to Plaintiff. This § 1983 action is a classic example of someone who has received medical treatment but prefers a different course of treatment, and, as discussed above, that does not equate to deliberate indifference. *See Hamm v. DeKalb Cnty.,* 774 F.2d 1567, 1565 (11th Cir. 1985) (Although plaintiff "may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference.").

2.    Count Two.

Plaintiff further asserts that Defendant Andrews is liable pursuant to § 1983 because he allowed an unreasonable delay between the time "a knot" was detected on Plaintiff's left-side and the filing of this lawsuit, where Plaintiff has yet to receive a M.R.I. scan.    To

19

succeed in proving that the delay of medical care rose to a constitutional violation, Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. . . . Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay. *Hill*, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted); *see also*, *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

While it is clear from the facts that Plaintiff has a medical need that must be addressed, it cannot be said that Plaintiff has been denied treatment or that any *unreasonable* delay ensued. Based on the records provided, Plaintiff received two x-rays, one CT scan, pain medications, and at least seven medical examinations from November 5, 2013 through July 2, 2014 regarding the knot on his left side. Additionally, it appears from Plaintiff's motion in opposition to Defendants' motion for summary judgment, he has continued to receive medical attention from the staff physician at Holman and that the medical staff is currently attempting to determine the best treatment plan for Plaintiff which may or may not involve

surgery. (*See* Doc. 45 at 4-5). Furthermore, every diagnostic imaging test has revealed negative results, leaving the physicians without a firm diagnosis. This amount of medical care cannot equate to deliberate indifference.

The Court recognizes that the knot on Plaintiff's side increased in size from May 31, 2014 to July 2, 2014. (*Compare* Doc. 33-1 at 16 to *id*. at 31). This time frame, however, is well after Defendant Barber ended her employment at Holman. Regardless of this change, as discussed above, Plaintiff has received continuous medical care and diagnostic scans in attempt to diagnose and treat the knot. He was never ignored by Dr. Barber, Mr. Andrews, or any medical staff member at Holman. He was never denied pain medication. He was never denied examinations. He was never diagnosed with a problem and denied necessary treatment for it. Veritably, there is no objective or subjective suggestion of deliberate indifference evidenced on the part of Defendants. Thus, Plaintiff cannot be successful on his claim merely because doctors have been unable to accurately diagnose and cure his injury.

**IV. CONCLUSION**

It is obvious that Plaintiff suffers from a condition that causes him discomfort and needs attention. It is also

21

clear from the evidence that identifying the source of his affliction has been difficult. But, also visibly evident from the record is the abundance of medical care Plaintiff has received and is continuing to receive at Holman. The fact that Plaintiff was and is regularly examined and treated for his condition by the medical staff belies any claim of deliberate indifference to his medical needs. *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) ("When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."). Thus, the Court determines summary judgment should be granted in favor of Defendant Andrews.

Based on the foregoing, it is recommended that the motion for summary judgment of Defendants Pamela Barber and Bennie Andrews be **granted** and that Plaintiff's action against Defendants be **dismissed** with prejudice.

### Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72.4. In order to be

specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this 17th day of October, 2014.

s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE